Deborah A. NORTHCROSS et al.,
Plaintiffs,

v.

BOARD OF EDUCATION OF the MEM-
PHIS CITY SCHOOLS et al.,
Defendants.

Civ. No. 3931.

United States District Court,
W. D. Tennessee, W. D.

May 1, 1970.

Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., Jack Greenberg, Michael Meltsner, Norman Chachkin, New York City, for plaintiffs.

Jack Petree, Evans, Petree, Cobb & Edwards, Memphis, Tenn., for defendants.

## OPINION

ROBERT M. McRAE, District Judge.

On March 9, 1970, 397 U.S. 232, 90 S. Ct. 891, 25 L.Ed.2d 246, the Supreme Court of the United States entered an order in this cause which provided in part that "the Court of Appeals' order of remand of December 19, 1969, be, and the same is hereby, affirmed with directions that the District Court proceed promptly to consider the issues before it and to decide the case consistently with Alexander v. Holmes County Board [396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19], and the case is remanded to the United States District Court for the Western District of Tennessee for that purpose."

The "Court of Appeals' order of remand of December 19, 1969" referred to

by the Supreme Court provided as follows:

"NOW, THEREFORE, IT IS HEREBY ORDERED that this cause be, and it is hereby remanded to the United States District Court for the Western District of Tennessee, Western Division, for further consideration of the plaintiffs-appellants' petition for further relief, and the plan, or any amendment thereto, to be presented to the District Court as required by its order of May 23, last." 420 F.2d 546.

The "plaintiffs-appellants' petition for further relief", referred to in the Court of Appeals' order of remand, was construed by this Court to mean the Motion for Summary Reversal and the subsequent Motion to Require Adoption of Unitary System Now, filed in the Court of Appeals in June 1969, and November 1969, respectively. "The plan, or any amendment thereto, to be presented to the District Court as required by its order of May 23", referred to in the Court of Appeals' order of remand pertained to the requirements set forth in the opinion of this Court filed May 15, 1969. In that opinion this Court directed the Board to file, prior to January 1, 1970, maps showing revised zone boundary lines, and enrollment figures of pupils attending school in the zones as of that time and of the pupils who live in the proposed revised zones, so that the Court might consider the adequacy of the revised zone boundaries and reconsider the transfer plan. The maps and enrollment figures were filed on December 31, 1969.

Upon consideration of the above, this Court entered an order setting a hearing on seven issues which the Court obtained from the former order of this Court and the applications for relief sought by the plaintiffs in the appellate courts. The hearing lasted seven and one-half days.

One of the issues included in the order of this Court for the hearing was stated as follows:

"Is the Board of Education operating a unitary school system consistent with the decision of the United States Supreme Court in Alexander v. Holmes County, a unitary system being defined as one 'within which no person is to be effectively excluded from any school because of race or color'?"

In its opinion of May 15, 1969, this Court considered the plan of desegregation of the defendant system in accordance with the "obligation" of district courts as announced in Green v. County School Bd. of New Kent County, Va., 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L. Ed.2d 716 (1968) wherein the Supreme Court stated:

"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation. There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in the light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness. Where the court finds the board to be acting in good faith and the proposed plan to have real prospects for dismantling the state-imposed dual system 'at the earliest practicable date,' then the plan may be said to provide effective relief. Of course, the availability to the board of other more promising courses of action may indicate a lack of good faith; and at the least it places a heavy burden upon the board to explain its preference for an apparently less effective method. Moreover, whatever plan is adopted will require evaluation in practice, and the court should re-

tain jurisdiction until it is clear that state-imposed segregation has been completely removed."

This Court found that the plan then in force and its modifications as proposed by the defendants did "not have real prospects for dismantling the state-imposed dual system at the 'earliest practicable date'." (Opinion of this Court May 15, 1969, p. 9). The Court then undertook to prescribe changes "in light of the circumstances present and the options available." In doing so the Court retained jurisdiction and postponed future consideration of the plan to insure that a constitutionally acceptable plan is operated to the end that "the goal of a desegregated, non-racially operated school system is rapidly and finally achieved." Raney v. Bd. of Ed. of Gould School Dist., 391 U.S. 443, 449, 88 S.Ct. 1697, 1700, 20 L.Ed.2d 727 (1968).

This Court construes Alexander v. Holmes County Bd., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969) to say: if a school system's plan of desegregation effectively excludes any person from a school because of race or color, the system is not unitary, and if a system is not unitary it is still dual. Applying this test to the plan of the defendants, the Court again finds, for the reasons hereinafter set forth, that the defendants are not maintaining a unitary system. It is therefore incumbent upon this Court to prescribe changes "in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness". Green v. County School Bd., supra, 391 U.S. at p. 439, 88 S.Ct. at p. 1695.

The defendant school system offers public education to all pupils residing within the corporate limits of Memphis, Tennessee. Its program is based upon elementary schools of grades one through six, junior high schools of grades seven through nine and high schools of grades ten through twelve. For the current school year, 1969–70, the system is operating 166 schools composed of 98 elementary schools, 42 junior high schools and 26 high schools. Except for Memphis Technical High School, each school had its own geographic zone to which all pupils in that area are originally assigned. Under the present plan of desegregation any pupil in the system may apply for a transfer to any other school in the system, subject only to the limitation of space in the school into which a transfer is sought. However, when there is a scarcity of space, majority to minority transfers have a priority.

Under this plan the enrollment figures show a total enrollment, exclusive of kindergarten pupils, of approximately 133,350 pupils of which 45.6% were white and 54.4% were Negro. Of the 166 schools there are 55 all Negro, 18 all white, 25 predominantly Negro and 68 predominantly white.[1]

It should be noted that the 1969–70 totals of 133,350 students in 166 schools increased from 123,280 students in 149 schools in 1968–69 due to the annexation of certain suburban areas. In January 1970, the city government made further annexations. The schools in these areas will be operated by the Shelby County Board of Education for the remainder of this school year. Next year the defendant system will take over the operation of these schools. The projected enrollment for the defendant system for next year is 147,078 students. Because the

1. It is interesting to note the different means which the parties have chosen to present statistics under our adversary trial system. The defendant board chooses to count all pupils in the biracial schools integrated and, by totaling the enrollment figures in those schools, the defendants assert that 47.3% of their pupils are attending desegregated schools. For example Cypress Junior High School is composed of 1569 Negroes and 1 white (T.E. 7). The defendant therefore contends that all 1570 pupils are integrated. On the other hand, by Trial Exhibit 33 the plaintiffs show 143 or 86.1% of the total 166 schools have racial majorities greater than 90%.

annexed area contains a substantial majority of white pupils, there will be 72,-367 or 49.2% white pupils and 74,711 or 50.8% Negro pupils (T.E. 34) and 196 schools (T.E. 33).

Historically the defendant system has never furnished transportation to and from schools for its pupils, except in unusual situations, such as to avoid isolated hazardous situations for small pupils. Some 5000 to 6000 pupils do use public transportation operated by the municipally owned Memphis Transit Authority over its regularly scheduled routes. Students are allowed to ride at certain hours for reduced fare.

Another issue set forth in the Prehearing Order of this Court was as follows:

"Should the Court require the defendants to adopt a new or modified plan of desegregation by any one or more, or a combination of the following methods: the institution of new geographical zone lines, the pairing of schools, the use of noncontiguous zones, or the cross-transportation of pupils between zones? In the event the Court concludes that it should require the adoption of a new or modified plan of desegregation by any one, or more, or a combination of the above methods, what should be the extent and location in the system of the required modifications?"

In 1962 the Court of Appeals for the Sixth Circuit ruled upon an earlier form of this defendant system's desegregation plan. Northcross v. Board of Education of City of Memphis, 302 F.2d 818. In disapproving the plan because the Board employed dual zones, the Court said:

"Minimal requirements for nonracial schools are geographic zoning, according to the capacity and facilities of the buildings and admission to a school according to residence as a matter of right." 302 F.2d at p. 823.

Thereafter, the Board adopted a plan of single geographical zones which was approved by the district court. This approval was appealed upon the grounds that the new zones were gerrymandered to preserve segregated schools. In 1964 the Court of Appeals considered the record before it and remanded the case with instructions to take further testimony on the question of zoning.

In that opinion the Court said:

"Where challenged the burden of proof is on the Board to demonstate that the zone lines of each school were not drawn with a view to preserve a maximum amount of segregation. Where the Board is under compulsion to desegregate the schools (1st Brown case, Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873) we do not think that drawing zone lines in such a manner as to disturb the people as little as possible is a proper factor in rezoning the schools. Nor do we think that preserving school loyalties, as defined by the Board, is a proper criterion." Northcross v. Board of Education of City of Memphis, 333 F.2d 661, 664 (C.A. 6 1964).

Thereafter the Board made changes in the elementary zone lines and progressively completed the establishment of unitary nonracial geographical zones for all schools in the system by the beginning of the 1966–67 school year. (Report of Board filed July 22, 1966). Since that time the Board has made changes in zones as circumstances necessitated, such as the expansion of the system by building or acquiring new schools or adding to existing ones.

In its opinion of May 15, 1969, this Court noted the continuing controversy and problems concerning the location of zone lines for a school system which has been required to desegregate. The Court ordered the defendants to file prior to January 1, 1970, maps showing revised zone lines and prescribed the criteria to be considered as follows:

"Factors to be considered in addition to more effective desegregation shall be the capacity of the schools, the location of students, the location of existing school facilities and the

safety of the students, including natural boundaries, railroad crossings and thoroughfares." (Opinion of this Court May 15, 1969, at p. 11).

Pursuant to this direction the Board made 17 zone boundary changes. Some will effect more desegregation, and others are based upon nonracial factors.

The establishment or alteration of zone boundary lines requires the application of judgmental determinations which can be extremely controversial, even when racial factors are not involved. Some parents in Zone "A" invariably assert that their street should be in Zone "B". When the sincerity of desegregation efforts are injected into the debate, all criteria are questioned.

Much of the proof in this hearing was directed to how the capacity of a school should be determined. In this regard, the Court is of the opinion that extreme caution should be taken in examining a map which shows disparate sized zones. The Court is further of the opinion that greater probative value must be given to the opinions of those persons familiar with the actual facilities and the manner in which they are used than those persons who have applied a formula based upon the number of classrooms multiplied by a standard number of pupils per classroom. (See testimony of O. Z. Stephens, Bd. of Ed. Dir. of Research and Planning, Tr. pp. 1466–1471). By the same token, the effect of natural boundaries or other separating obstacles between zones, such as railroad yards and industrial parks, cannot be appropriately evaluated by observation of a map.

The record reflects that the mobility of families or lack thereof has lessened the overall effectiveness of zoning as a means of increasing the biracial ratio of pupils. On the one hand, in many of the densely populated Negro areas the tendency has been for the zones to become more densely populated with additional Negroes, and on the other hand, there has been a tendency for whites to move from certain areas as the percentage of Negroes increases in the area. For example, the Court noted in its May 15, 1969 opinion that Hollywood Elementary School had changed from 371 whites and 5 Negroes in 1963–64 to 814 Negroes and no whites in 1968–69, and Longview Elementary School had changed from 592 whites and 265 Negroes in 1965–66 to 1290 Negroes and 16 whites in 1968–69. (Opinion of this Court May 15, 1969, at p. 6). The 1969–70 enrollment figures show that Hollywood School now has 878 Negroes and no whites and Longview has 1360 Negroes and 6 whites.

Although the defendants should not refrain from altering zone lines because of possible adverse racial reaction, they can hardly be faulted for factors over which they have no control.

■ Upon consideration of the entire proof and in the light of the various factors which must be considered in the establishment and alteration of zone boundaries, the Court finds that the defendants have not gerrymandered the lines to perpetuate segregation, nor have the defendants failed in the performance of their affirmative duty by their revision of the zone lines. In this regard the Court is of the opinion that the defendants are not charged with the same degree of responsibility in the annexed areas which they will take over in the school year 1970–71. It is assumed that they will adjust those zone lines, as well as others, in accordance with their constitutional duty as circumstances require.

■ Another phase of the proof with regard to zone boundaries addresses itself to the assignment of pupils who live on a zone boundary street and "pockets and coves" leading off the boundary street.[2] (See T.E. 42 for a partial list of pocket and cove zones). The policy of the Board is to allow these pupils to attend the school in either of the zones

2. "Pockets and coves" is a term used to describe those coves, single streets or pockets of streets which are cul-de-sacs with regard to a single boundary street.

separated by the boundary street. Because the defendant system does not furnish transportation this policy is based upon accessibility. In many cases it does not involve segregation, for example Hamilton and Melrose Senior High zones involve pockets and coves, these are both all-Negro schools. On the other hand, some undetermined amount of desegregation might be involved in the "pockets and coves" between Messick, predominantly white, and Melrose, all-Negro.

This Court is of the opinion that this policy should be allowed to continue and that consistency requires that it be used where applicable, even though the adjacent zones might be a different predominant race. It should be remembered that the pupils have an option to attend either school. However, the Board should file with its plan a definition of its zone boundary policy and a complete list of what streets are considered "pockets and coves" and for which zones.

■ Another proposed method of desegregation raised by the plaintiffs in their Motion in the Court of Appeals was pairing of schools by reassigning and swapping part of the pupils from two separate schools, thereby making each school more biracial. The Court is of the opinion that pairing is not invariably required by the Constitution and, upon consideration of the proof, the Court is of the opinion that pairing is not feasible in this system which furnishes no transportation and which is designed to minimize the distance the pupils must travel to reach school. This would present particularly difficult problems in the grades nine through twelve, where the curriculum is more complex.

This Court noted in its May 15, 1969 opinion that the racial residential patterns are heavily concentrated in widely separated parts of the city and, therefore, no substantial desegregation can be effected without transporting pupils, in some cases many miles. The annexations which have been made since the 1969 hearing have made this problem even more acute.

■ It is the contention of the plaintiffs that transportation of pupils is necessary for the defendants to accomplish a unitary school system (Proposed Findings of Fact and Conclusions of Law of Plaintiffs, p. 36).

In its order of January 12, 1970, the Court of Appeals stated:

"Upon the oral argument of this appeal, we asked counsel for the plaintiffs to advise what he considered would be the 'unitary system' that should be forthwith accomplished in Memphis. He replied that such a system would require that in every public school in Memphis there would have to be 55% Negroes and 45% whites. Departures of 5% to 10% from such rule would be tolerated."

In this hearing after the remand, the plaintiffs have not contended for a ratio that specific. Counsel for the plaintiffs have included in their proposed findings of fact, on page 34, this provision:

"Although much can be done by use of other methods toward accomplishing a unitary school system in Memphis, it is apparent that to some extent, as yet undetermined, the transportation of pupils will be required in removing the racial identity of the schools in the defendant system."

Presumably, the plaintiffs wish the Court, the defendant Board or an expert appointed by the Court to determine what percentage of pupils and which ones will be transported to remove the racial identity in the schools.

Plaintiffs offered proof through Dr. Robert L. Green, Assistant Provost of Michigan State University, that racial isolation is damaging educationally to both black and white youngsters because Negro pupils perceive they are inferior and white pupils perceive they are superior. (Tr. 644–46).

Dr. Green also testified that the dual system of education mitigates against

improvement in academic achievement for black students and that this was shown to be the case in Memphis by the comparison of the achievement test scores of Negro and white pupils. (Tr. 697).

The comparisons of Metropolitan Achievement Test scores used by Dr. Green as a basis for his testimony are set forth in Trial Exhibit 28. This exhibit was prepared by the plaintiffs from information furnished by the defendant system. It compares the scores of all students in the schools having more than 90% Negro students with all the students in the schools having more than 90% white students. The exhibit reflects a sharply increasing disparity between the students. At grade one the level of 90% Negro schools is 1.8 and of the 90% white schools is 2.2. At grade eight the level of the 90% Negro schools is 6.7 and of the 90% white schools it is 9.2.

Although the accuracy of achievement tests is controverted by the proof and the methods used in the preparation of the exhibit are questioned, the proof does establish that a serious discrepancy exists between the achievement levels of pupils of different socio-economic levels. It is an inescapable conclusion that Negroes predominate in the lower socio-economic level in the City of Memphis. There is nothing in the record to otherwise establish that there is a different level of learning ability between the races, that is to say the Court does not find that members of the white race learn more or better than Negroes merely because of the racial differences.

This serious problem has existed for many years and is not peculiar to the Memphis system. The exact causes are not known nor are the cures. This Court concludes from the proof that the solution is not to be found in transporting an undetermined number of Negro or white students to distant parts of the city. The transportation time and money could be more profitably spent by attacking the disparity of achievement problem in other ways, and no problem should have a higher priority.

In this Circuit the courts have held that the Constitution does not require that racial balances in the schools must be achieved. Order in this cause of the Court of Appeals for the Sixth Circuit of January 12, 1970, 420 F.2d 546, reversed on other grounds 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970); Robinson v. Shelby Cty. Bd. of Ed., 311 F. Supp. 97 (W.D.Tenn. Opinion C. J. Brown, 1970).

The Court of Appeals for the Eighth Circuit has recently considered the El Dorado, Arkansas School integration case in the light of Alexander v. Holmes Cty. Bd. Kemp v. Beasley, 423 F.2d 851 (C.A. 8 1970). In that case the Court said:

"We do not rule that busing is a constitutional imperative. Busing is only one possible tool in the implementation of unitary schools. * * * It may or may not be feasible to use it, in whole or in part * * *.

"We do not rule that precise racial percentages across the District at the respective elementary, junior high, and high school levels are as yet constitutionally required. Evidently, when precise Percentages are achieved, suspicion does tend to vanish. But we are not yet prepared for the sacrifice of other values at the altar of uniform percentages". p. 857.

"We do not read Alexander as demanding strict percentages. Alexander lays stress upon 'unitary schools' and upon the elimination of any 'dual school system based on race.' Its emphasis is on the system 'within which no person is to be effectively excluded from any school because of race or color.' 396 U.S. at 20, 90 S.Ct. [29] at 30. What appears to be important are the words 'effectively excluded.'" p. 858.

The Court concludes that the transportation of pupils to overcome the racial imbalance caused by residential patterns is not constitutionally required nor

is it a feasible method of desegregation for this system.

As the Court indicated on pages 4 and 5 of its May 15, 1969 opinion, the defendants might find it appropriate to use buses for the transportation of pupils when circumstances warrant that procedure, such as to avoid permanent additions to overcrowded schools in areas of shifting population. Although desegregation might or might not be a factor in those instances, the different racial makeup of the zones involved certainly should not be a deterrent. In fact, the opportunity for desegregation in those instances should be pursued when possible and feasible.

Regrettably, in recent months the word "bus" has become an inflammatory word among many citizens of this community. This has created suspicion of all programs sponsored by the defendants which involve the transportation of students by bus. One of the programs which has suffered from this is the Cultural Exchange Program.

The Cultural Exchange Program is a supplemental phase of the Board's plan of desegregation whereby pupils from one school visit pupils in another school with emphasis on having the exchange involve schools of different predominant racial makeups. This program was implemented at the beginning of the current school year pursuant to a proposal of the defendants and approved by this Court. In its opinion of May 15, 1969, the Court directed that the Board appoint a Director of Desegregation to be responsible for the exchange program among other things. It should be noted that in the order entered pursuant to the Court's May 15 opinion, by consent of counsel, the name of the directorship

was changed to Director of Race Relations. The Board appointed to this directorship C. J. Patterson. Mr. Patterson is a Negro who was educated in the defendant system and later obtained a Bachelor of Arts Degree and a Master's Degree. He has had experience as a teacher, principal and supervisor in the defendant system. As Director of Race Relations he has assumed a very difficult job in which the Court finds he has performed exceptionally well under the circumstances. He is one of the first Negroes to obtain a high administrative position with the Memphis Board of Education which has an elected all-white Board and a white superintendent with five white assistants.

Under Mr. Patterson's direction 66 exchanges had been made through March 19, 1970. (See Report of Director of Desegregation filed March 20, 1970). This program shows considerable promise in the area of desegregation if it is substantially expanded. It should be noted that its scope was diminished because it was presented on a voluntary basis, and the use of buses in the performance of it, therefore, discouraged some participation for the reasons set forth above. Furthermore, in its initial year the school system experienced an extended and disruptive boycott sponsored by the local chapter of the NAACP protesting the lack of Negro representation on the Board and its racial policies.[3]

 Another issue set forth in the Prehearing Order was:

"Should this Court eliminate the freedom of transfer provision heretofore approved by this Court?"

The consideration of this issue arises from this Court's opinion of May 15,

---

3. The Court has deliberately refrained from ruling upon the issues involved in the boycott because there is pending in this cause a third party action by the defendant Board against the NAACP, the American Federation of State, County and Municipal Employees, AFL-CIO and certain individuals for injunctive relief and damages incurred during the boycott.

The proof in this hearing concerning the boycott has been considered only insofar as it affects needed changes in the plan of desegregation. The Court has heretofore considered and ruled upon a case involving the discipline of pupils in the schools during the boycott. See Hobson v. Bailey, 309 F.Supp. 1393 (W.D.Tenn. Feb. 20, 1970).

1969 page 11, wherein the Court indicated that the adequacy of the transfer program would be considered after the defendant Board filed its revised zone boundary lines prior to January 1, 1970.[4]

From the "pupil Population in Attendance Area" figures and the transfer records filed by the defendants on December 31, 1969, the Court finds that 2439 white pupils are living in all or majority Negro zones and that a substantial number of these pupils are transferring to white schools, thereby effectively diminishing desegregation. When it is realized that there are 133,350 pupils in the system, this might seem *de minimis non curat lex,* but these are constitutional issues and Alexander v. Holmes Cty. Bd. defines a unitary system as one "within which no person is to be effectively excluded from any school because of race or color." Furthermore, it is not as *de minimus* when it is compared to the total number of whites who are in racial minority schools in the entire 166 schools. That total number is 1013.

It should also be noted that some Negroes are transferring from majority white zones to all Negro schools, for example 7 of 32 transfers to Lester, an all-Negro school, were from majority white zones.

Upon reconsideration of the defendant's freedom of transfer policy in the light of Alexander v. Holmes Cty. Bd., the Court concludes that it does not meet the standards of a unitary system. It should be altered so that a pupil who is a member of a minority race in the zone of that pupil's residence shall be assigned to the zone of his residence and shall not be allowed to transfer to a school in a zone where he would be in a majority racial enrollment. One exception to the above shall be any pupil who has a parent who is employed by the defendant system as a teacher or otherwise and who is regularly assigned to a particular school. In that event the pupil may accompany his parent to that particular school. The other exception shall be handicapped pupils in special education courses.

While it is true that under this unitary zone system the parents can move their residence and thereby defeat desegregation, there is no assurance that all will move. Furthermore, this change will relieve the Board of an apparent inconsistency in its position with regard to desegregation, namely, on the one hand the defendants contend that they are not effectively excluding students from any school because they cannot and do not control where they live, on the other hand the defendants contend, *inter alia,* that they should continue absolute freedom of transfer otherwise they will cause some students to move.

Because the goal is desegregation, and a relative few have borne the burden of desegregation under the existing plan, transfers from a majority to a minority should be allowed and even encouraged, subject only to space in the school in the zone into which the transfer is sought.

Because majority to majority and minority to minority transfers often involve transfers which afford employment or child care activities and, further because they do not effectively exclude persons from any school because of race or color, they may be continued by the Board, subject to a priority of the majority to minority transfers provided for above.

The Board shall cause its transfer policy to be announced to every student in writing as soon as possible and at least annually thereafter. In this regard the defendants failed to comply with the Court's direction in its May 15, 1969 opinion wherein the Court directed the defendants to "appropriately announce" the majority to minority preference under the existing plan. It was not published or publicized in any way nor was

---

4. The hearing on the zone boundaries and the adequacy of the transfer plan was deferred because the plaintiffs had motions for affirmative relief in the appellate courts. See this Court's Order Delaying Hearing entered Feb. 4, 1970.

it included on the transfer card distributed recently to all students for delivery to their parents. (Tr. 198, 99).

Due to the proximity of the end of the 1969–70 school year and further due to the fact that certain transfers for next year, already exercised in March of this year, will have to be reprocessed and cancelled, the new transfer policy will not take effect during this school year but will take effect for all grades at the beginning of the 1970–71 school year.

The above mentioned transfers next year and in future years will be sought and granted prior to or at the beginning of the school year in accordance with regulations and in the manner prescribed by the defendant system; provided however, provisions shall be made for transfers during the year in the event a pupil and his parents or custodial guardian move their actual place of residence during the year.

■ The record reflects that the defendant system follows the practice of allowing students who live outside the Memphis city limits to attend schools of the defendant system upon a tuition basis and subject to available space. In the school year 1968–69, 365 white and 6 Negro pupils from outside the system attended under those circumstances (T. E. 39). Many of these are from Shelby County outside the city boundaries. In the application and acceptance of pupils from other school systems, the defendants will apply the same standards that are applied to transfers within the defendant system. This system shall require the parent of the applying student to furnish the name of the school to which the pupil would be assigned in the system of his residence and the majority race of that school. The applicant then will be assigned to a school in the defendant system having the same majority race.

■ Another issue which was set forth in the Court's Prehearing Order was stated as follows:

"Should the Court require a reassignment of faculty and staff so that each school, within a margin of 10%, will reflect the ratio of Negro and white teachers in the system?"

Faculty desegregation in the regular program of the defendant system was not started until the 1966–67 school year. The defendants' plan at that time provided, in part, as follows:

"3. The Board of Education will make all initial assignments of newly employed and transfers of presently-employed teachers to schools in which the majority of faculty members are of a race different from that of the teacher to be assigned or transferred. Such assignments and transfers will be made by the Board in all those cases in which the teachers are qualified and suitable, apart from race or color, for the position to which they are to be assigned or transferred." (Modified Desegregation Plan filed by defendants in this cause June 22, 1966).

The Motion for Further Relief, filed July 26, 1968, addressed itself in part to faculty desegregation. As this Court indicated in its opinion of May 15, 1969, a portion of that motion was heard by the Honorable Bailey Brown, Chief Judge of this District. Prior to the preliminary hearing conducted by Judge Brown, he suggested in conference that the defendant system make additional minority faculty reassignments prior to the beginning of the 1968–69 school year. The Board reluctantly complied with this suggestion so that in 1968–69 there was at least one minority assignment to every school in the system except one. As of January 17, 1969, there were 441½ minority assignments to the entire system compared with 226 minority assignments during the 1967–68 school year. (Opinion of this Court filed May 15, 1968, p. 8).

Because this Court was of the opinion that the effectiveness of the defendant system's faculty desegregation plan of July 1966 did not meet the standards set forth in *Green*, namely "at the earliest practicable date," and further, because it was not anticipated that the defendant system would experience substantial pu-

pil desegregation, this Court in its May 15, 1969 opinion directed the defendants as follows:

"The defendant Board in this case shall adopt a plan of faculty desegregation whereby supervisors, principals, teachers and other faculty personnel shall be employed, promoted and assigned in furtherance of a goal of removing the racial identity of each school, but no teachers shall be discharged from the system to correct a racial imbalance.

"An interim target for this goal shall be that at least 20% of the teachers of the system will be assigned to racially minority faculty positions in the year 1969–70. This percentage shall be systemwide and shall not necessarily require 20% in each school in 1969–70.

"Teachers shall be assigned on the basis of certification and qualification for the academic subjects or grade level to be taught. Assignments to racially minority faculties shall not be left to the choice of the teacher. Monroe v. Board of Commissioners, 380 F.2d 955 (C.A. 6, 1969).

"The Board shall have properly trained personnel conduct appropriate seminars and programs for *all* teachers in the system to prepare *all* faculty personnel for desegregated faculties. In this regard the properly trained personnel may be from within or without the system, provided they are properly trained for that purpose and are dedicated to a program of desegregated faculties." (Opinion of this Court May 15, 1969, pp. 13, 14).

Based upon the proof offered at the recent hearing, the Court finds that the defendants did in fact open the current school year with 20.89% of their total faculty assigned to racial minority situations and that as of January 30, 1970, the percentage of faculty members in racial minority assignments was 21.06%. This was based upon a total of 5904 faculty members, of which 42.68% are Negro and 57.32% are white. (Tr. 480). However, the methods used to comply with the Court's order and direction leave much to be desired with regard to the overall goal of removing the racial identity of the faculty of each school. Although the defendants did not appeal the Court's ruling, the defendant E. C. Stimbert, Superintendent of Schools, publicly encouraged the teachers to resist the transfer plan. (Tr. 936). One Board member, Hugh Bosworth, provided a meeting place for teachers who were opposed to the transfer plan. (Tr. 1143, 44).

Compliance with the Court's order required the transfer of only 295 teachers already employed by the system, in addition to the teachers already assigned to minority situations from the year before and the newly hired teachers given racial minority assignments. Although the precise method of asking for volunteers is not shown by the record, the defendants did ask for volunteers from the teachers who were already in the system. The record reflects that this produced a mere 12 volunteers from in excess of 4000 teachers available in the system. (Tr. 393).

Officials of the defendant system undertook to meet the transfer requirement by means of a lottery wherein geographical groupings of schools were made and drawings were held for the swapping of teachers of similar qualifications. Prior to instituting the lottery, the Board adopted a policy that in no school in the system would a racial minority exceed 35% (Tr. 394). After the lottery was completed, registered mail notification was sent to the teachers whose names had been drawn and a program of orientation was set up for these teachers in groups of approximately 30 per session.

E. C. Thompson, Jr., Assistant Superintendent for Administrative Services, which includes personnel, testified during the hearing that he was of the opinion that a number of the teachers were misassigned by the method used by the defendants. (Tr. 411). For the coming year and future years, Mr. Thompson recommends that the Court approve a

faculty desegregation plan whereby racial minority assignments be confined to teachers hired to fill normal annual vacancies, but not in every case. (Tr. 418, 19).

In addition to the problems which arose from the initial efforts to comply with the Court's direction, there have been further problems with regard to the racial minority teachers, due to the boycott which occurred in the fall of 1969. It created problems which have affected the recruiting of new teachers and caused complaints from some teachers who were involuntarily transferred. Furthermore, the record reflects that there is a decrease in qualified Negro teachers because educated Negroes now have more opportunities in other fields and, therefore, are not as restricted to the field of education as was the case formerly. The Court also finds from the proof that as of the date of the hearing, the defendants had not complied with the direction of this Court that *all* faculty members be trained for desegregated faculties.

Trial Exhibit 6 reflects the racial makeup of the principals, assistant principals and teachers of the various schools and shows every school listed thereon has some racial minority teachers. It should be noted that this does not include the schools which will be taken into the system through annexation at the beginning of the 1970–71 school year, and there are some schools not included, such as Campus School, an affiliate of the defendant system located at Memphis State University where many recruits of the defendant system are trained.

The record also reflects that officials of the defendant system have difficulty in determining how to arrive at the proper criteria for meeting the Court's direction to remove the racial identity of the faculties in the various schools. This is understandable when it is realized that the authorities recognize that district courts may set minimum standards but, at the same time, should allow for flexibility in the difficult area of faculty assignments in desegregation. United States v. Montgomery Cty. Bd. of Ed., 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). Some cases have set goals of ratios in each school based upon the total number of Negro teachers and white teachers in the entire system, with appropriate leeway allowances. Board of Ed. of Okla. City Public Schools v. Dowell, 375 F.2d 158 (C.A. 10, 1967); Robinson v. Shelby Cty. Bd. of Ed., 311 F.Supp. 97 (W.D.Tenn., 1970).

Due to the problems peculiar to this defendant system and because the defendants did meet the minimal requirements, this Court is of the opinion that a definite ratio should not be prescribed for the coming year. However, because the defendants have not accepted their duty to desegregate the faculties in accordance with the spirit of Green v. County School Bd. with regard to time, see United States v. Montgomery Cty. Bd. of Ed., *supra*, 395 U.S., at p. 235, 89 S.Ct. 1670, and, further, because the defendants have not complied with this Court's direction to train *all* faculty members in the defendant system, this Court is of the opinion that outside assistance should be obtained by the defendants in developing and executing a more effective plan of faculty desegregation. The defendants are directed to seek the assistance of the Title IV Educational Opportunities Planning Center, College of Education, University of Tennessee, Knoxville, Tennessee. The Center shall be requested to investigate the problems concerning faculty desegregation in the defendant system and to make appropriate recommendations in the light thereof, to the end that further and more expeditious faculty desegregation will occur commencing with the year 1970–71. The Center shall also be requested to prescribe and assist in conducting appropriate seminars and programs for *all* teachers in the system to prepare *all* faculty personnel, including those not transferred, for desegregated faculties. Although the Court does not set a specific ratio for the coming year, for the guidance of the Center and the defend-

ants, the Court directs that future faculty desegregation should not be confined to newly hired teachers and directs that the limit on faculty desegregation adopted by the defendants in the amount of 35% for each school shall be removed so that maximum faculty desegregation in appropriate situations may not be restricted.

 With regard to this system's faculty desegregation efforts, it should be remembered that the Constitution requires faculty desegregation as an important aspect of achieving a public school system wholly free from racial discrimination, United States v. Montgomery Cty. Bd. of Ed., *supra*, 395 U.S. at p. 231, 89 S.Ct. 1670; and the vitality of constitutional principles cannot be allowed to yield simply because of disagreement with them. Monroe v. Board of Comm'rs., 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). Furthermore, this Court is of the opinion that the 1964 holding of the Court of Appeals in this cause regarding criteria for drawing zone lines, is equally applicable to faculty desegregation. Preserving school loyalties acquired prior to 1966 when the regular faculties of this system were totally segregated, is not a proper criterion to avoid or delay appropriate faculty desegregation. Northcross v. Board of Ed., 333 F.2d 661, 664 (C.A. 6, 1964).

The initial request shall be made of the Title IV Center immediately. As soon as possible thereafter officials of the Center and the defendant system shall file a report with the Court setting forth a proposed program for carrying out the directions of this Court with regard to faculty desegregation.

 Another issue set forth in the Prehearing Order was stated as follows:

"Should this Court enjoin further construction by the defendants pending adoption of a new pattern of school organization?"

This issue was obtained from the Motion to Require Adoption of Unitary System Now, originally filed in the Court of Appeals on November 3, 1969. Therefore, it was before the Court of Appeals and, subsequently, the Supreme Court on certiorari.

After remand very little specific proof was addressed to this issue. Upon the proof offered, the Court is of the opinion that no injunction should issue with regard to further construction. However, in order to comply with the directive of Alexander v. Holmes Cty. Bd. and in order to avoid after the fact litigation, there shall be substituted for the present provisions of the plan with regard to construction the following:

"New schools, additions to existing schools and the use of portable classrooms shall be programmed, planned and constructed in furtherance of the Board's duty not to effectively exclude any person from any school because of race or color, and in accordance with other factors such as financial limitations, location of students, age level of the students, safety of the students and other relevant non-racial factors.

"Prior to final commitment for site acquisitions and prior to final construction commitment the defendant Board shall file in this cause and serve upon counsel of record for the plaintiffs a statement indicating the location and size of proposed site acquisitions for new schools or substantial additions to existing schools and the approximate size and planned use for the new building or substantial addition to an existing building. If no objections are filed in this Court to the proposed acquisition or construction plans within twenty days the proposal shall be considered acceptable and no further proceedings will be held. If objections are timely filed, an appropriate hearing shall be promptly scheduled by the Court."

The two remaining issues set forth in the Prehearing Order were the scope of any plan to be requested from the United States Department of Health, Education and Welfare or any other facility, and when any relief sought by the plain-

tiffs and granted by this Court should be placed in effect. The former of these two issues shall be limited to the request of the Title IV Center at the University of Tennessee pertaining to further faculty desegregation. The changes in the plan referred to herein shall take effect at the commencement of the 1970–71 school year, except the change pertaining to site acquisition and planned construction which shall take effect immediately with regard to any sites or construction not already acquired or for which final commitment has not already been made.

The defendants shall promptly file a Further Revised Plan consistent with this opinion and shall incorporate therein the provisions of the existing plan (T.E. 1) to the extent that they are not inconsistent with this opinion. There should be attached to the plan, maps which accurately reflect the existing zones for all schools. There should also be included in the plan a provision requiring the defendants to file a report on or before October 10 each year which shall include the total enrollment in the system and in each school by race; the transfers granted, by schools and by categories of majority to minority, majority to majority and minority to minority zones; any changes made in the zone boundaries, including pockets and coves, since the last report and the totals by race of the principals, staff members and teachers in the system and in each school.

Initially this Further Revised Plan shall incorporate in its faculty section the provisions of the existing plan not inconsistent with this opinion, and shall include a provision that the faculty plan will be made more specific after the Title IV Center has made its investigation and report.

Upon approval of the Further Revised Plan, it is the opinion of this Court that the defendants will be operating a unitary system subject to evaluation in practice, and the Court will retain jurisdiction for that purpose. Green v. County School Bd., *supra*, and Raney v. Board of Ed., *supra*.

This opinion shall constitute the findings of fact and conclusions of law of this Court as contemplated by Rule 52 of the Federal Rules of Civil Procedure and a separate judgment as required by Rule 58 shall be entered in the cause.