**Deborah A. NORTHCROSS et al.,**
**Plaintiffs-Appellants,**

v.

**BOARD OF EDUCATION OF MEMPHIS**
**CITY SCHOOLS, Defendant-Appellee.**

**Deborah A. NORTHCROSS et al.,**
**Plaintiffs-Appellees,**

v.

**BOARD OF EDUCATION OF MEMPHIS**
**CITY SCHOOLS, Defendant-Appellant.**
**Nos. 20533, 20539.**

United States Court of Appeals,
Sixth Circuit.
June 7, 1971.

Louis R. Lucas, Memphis, Tenn., for Northcross and others; Ratner, Sugarmon & Lucas, Memphis, Tenn., Jack Greenberg, Norman J. Chachkin, New York City, on brief.

Jack Petree, Memphis, Tenn., for Board of Education and others; Evans, Peyree, Cobb & Edwards, Memphis, Tenn., on brief.

Before WEICK and CELEBREZZE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

Following the remand which we ordered in the previous appeal reported in 420 F.2d 546 (1970), affirmed as modified in 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), the District Court conducted an extensive evidentiary hearing lasting seven and one-half days, and handed down an opinion ordering the Board of Education to take additional steps designed to convert the dual system to a unitary system. D.C., 312 F. Supp. 1150 (1970).

Plaintiffs were dissatisfied with the order, and appealed. The Board cross-appealed from that part of the order which related to faculty desegregation.

After oral argument, and while the appeals were under advisement, the Supreme Court decided Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Comm'rs of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); North Carolina State Bd. of Educ. v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586; McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 and Moore v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 47, 91 S.Ct. 1292, 28 L.Ed.2d 590, in which Mr. Chief Justice

Burger delivered the opinions for a unanimous Court. The opinions contained helpful guidelines for the desegregation of state-imposed segregated school systems.

The appellants, relying on these decisions and other authorities, have filed in the above appeals and in four other appeals pending in this Court, a document entitled, "Motion of Plaintiffs-Appellants to Expedite Determination of Appeals." In the motion it is suggested that the cases be remanded to the District Court and that we issue comprehensive directions contained in paragraphs 1 through 11, which include the filing of a new plan for desegregation within two weeks, eliminating all vestiges of segregation, and containing the standards which such plan should meet; to allow plaintiffs to object and file a new plan; to require the Court to appoint an educational expert to aid it in developing an adequate plan; to authorize plaintiffs to employ an educational expert, at the expense of the School Board, to assist plaintiffs; to direct the School Board to co-operate with plaintiffs' expert, including the furnishing of space at the headquarters of the Superintendent of Schools, and granting the expert all information concerning the school system which he may deem necessary, paying all of his fees and expenses, providing him with stenographic assistance, and the help of business machines, draftsmen, and computers, if required, together with telephone and other communications services; to promptly schedule a hearing required to implement a completely unitary school system effective at the commencement of the 1971–72 school year; to enjoin the construction of new schools, except under certain conditions; to enter an order to implement faculty desegregation policies contained in a four-page exhibit "A"; to direct the defendants to file semi-annual reports and other information as required by a three-page exhibit "B"; to allow plaintiffs their costs, including reasonable attorneys' fees.

Our consideration of the two above-captioned appeals convinces us only that they should be remanded to the District Court for prompt consideration in the light of *Swann* and *Davis*.

We decline to direct the District Court as suggested in the eleven paragraphs and two attached exhibits in appellants' motion. These suggestions should more appropriately be addressed by appellants to the District Court upon the remand. It is clear from *Swann* that broad power is vested in the District Court to fashion remedies in school desegregation cases.

Desegregation cases present widely divergent problems. The facts in the present appeals are much different from those in *Swann* and *Davis*. An appellate court does not try cases de novo. We review cases on questions of law. We ought not to enter the suggested order, which would virtually make of the District Court an automaton.

The history of the Memphis school desegregation is set forth in the previous appeal. Different problems have been presented to us on each of the reviews.

The projected enrollment in the Memphis schools for 1971–72, in 196 schools, is 147,078, of which 74,711, or 50.8% are Negro children, and 72,367, or 49.2% are white children. In 1969–70 the enrollment in 166 schools was 133,350, of which 54.4% were Negro pupils, and 46.5% were white pupils. 98 schools were elementary grades, 42 were junior high, and 26 were high schools. This is an increase from 123,280 children in 149 schools in 1968–69, which was occasioned by annexation of part of Shelby County. In January, 1970, there were additional annexations.

Each school has its own geographic zone, to which pupils living in the area are assigned, with the exception of Memphis Technical High School.

The Negro population for the most part is heavily concentrated in certain areas of the city. It has been the practice of the Board of Education to locate schools in areas where the children live. The Board of Education disclaimed re-

sponsibility for the residential patterns of the city, claiming that they are caused by economic conditions, over which the Board has no control.

The population in certain school zones has not been stationary. For example, Hollywood Elementary School has changed from 371 white and 5 Negro children in 1963–64, to 814 Negroes and no white children in 1968–69. In 1969 and 1970 the enrollment in Hollywood was 878 Negroes and no white children. Longview Elementary School has changed from 592 white and 265 Negro children in 1965–66 to 1290 Negro and 16 white children in 1968–69, and in 1969–70 to 1360 Negro and 6 white children. In certain areas, there has been a flight of the white population. It has not been suggested that the Board can stop that flight, or that it should chase after them. Nor can the Board very well control the mobility of the Negro population. The Memphis school officials, however, have attempted to ease residential and school-attendance patterns by working with the Memphis Housing Authority, and others, urging that public housing not be concentrated in any one area of the city. Although to date they have had only limited success, their efforts in this direction are to be commended.

The parties present their statistical information differently. As stated by the District Judge in a footnote:

"[1] It is interesting to note the different means which the parties have chosen to present statistics under our adversary trial system. The defendant board chooses to count all pupils in the biracial schools integrated and, by totalling the enrollment figures in those schools, the defendants assert that 47.3% of their pupils are attending desegregated schools. For example Cypress Junior High School is composed of 1569 Negroes and 1 white

(T.E. 7). The defendant therefore contends that all 1570 pupils are integrated. On the other hand, by Trial Exhibit 33 the plaintiffs show 143 or 86.1% of the total 166 schools have racial majorities greater than 90%." 312 F.Supp. 1153.

While a school may be said to be desegregated if children from both races are permitted to attend, nevertheless the above statistics indicate that all vestiges of segregation may not have been eradicated. At the same time, under the guidance of the District Court substantial progress has already been made in that direction.[1]

There are "pockets and coves" which involve "single streets or pockets of streets which are cul-de-sacs with regard to a single boundary street." Only a partial list of pocket and cove zones appear in the record. The Board contends that it has permitted the pupils in these areas to attend the schools in either of the zones separated by the boundary street, but this is disputed.

In Melrose and Hamilton Senior High School zones pockets and coves are involved and they are both all-Negro schools. This could not be changed without furnishing transportation, which at present the Board does not provide. Messick is predominantly white, and Melrose all Negro, which could be desegregated without transportation. The District Judge ordered the Board to file a complete list of the pockets and coves and the zones, in order that this problem may be considered further.

All appropriate means to effectuate further desegregation should be considered. It would be beneficial if the Court had a pupil-locator map.

With respect to providing transportation for pupils, the District Court stated:

"Historically the defendant system has never furnished transportation to

---

1. The District Court dealt with many difficult and complex problems, including "an extended and disruptive boycott (of the school system) sponsored by the local chapter of the NAACP protesting the lack of Negro representation on the Board and its racial policies." 312 F.Supp. 1158. In Tennessee Board members are elected by the voters.

and from schools for its pupils, except in unusual situations, such as to avoid isolated hazardous situations for small pupils. Some 5000 to 6000 pupils do use public transportation operated by the municipally owned Memphis Transit Authority over its regularly scheduled routes. Students are allowed to ride at certain hours for reduced fare." 312 F.Supp. 1154.

The present case may be distinguished from *Swann* in that extensive busing had been previously provided in connection with the regular operation of Swann's school system. The Board in *Swann* had totally defaulted in its duty to submit an acceptable plan, and adopted an arbitrary attitude.

■ We do not read *Swann* and *Davis* as requiring the District Court to order the Board to provide extensive transportation of pupils to schools all over the city, regardless of distances involved, in order to establish a fixed ratio in each school. The factors to be considered are given in these cases. Busing is only one of a number of choices available to the District Judge in fashioning a remedy. It may be mandatory in some areas, such as in the pockets and coves, pairing of schools, transfers, or in the annexed areas.

Relative to one-race schools, the Supreme Court in *Swann* stated:

"In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school author-

ity's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part."

■ The District Court ordered a drastic change in the Board's transfer plan, which had permitted transfers to any school in the system, subject only to limitation of space. When there is a scarcity of space, majority to minority transfers have priority. The Court found that this policy did not facilitate desegregation and ordered that it—

" * * * should be altered so that a pupil who is a member of a minority race in the zone of that pupil's residence shall be assigned to the zone of his residence and shall not be allowed to transfer to a school in a zone where he would be in a majority racial enrollment."

Exceptions were made for handicapped pupils and for pupils whose parents work in a particular school. Transfers from majority to minority are encouraged. Such transfers were recommended in *Swann*.

Relative to experts, we assume that the District Court can obtain without charge assistance from H.E.W. and from Title IV Educational Opportunities Planning Center, College of Education at the University of Tennessee. Whether the Court should employ any additional experts is a matter involving its sound discretion.

The District Court has already invoked Title IV assistance from the Uni-

versity of Tennessee for faculty desegregation, and has that matter under consideration.

Guidelines for school construction are contained in *Swann* and in our opinion handed down concurrently herewith in case number 71–1174, 6 Cir., 444 F.2d 1184.

The appeals are remanded to the District Court for further proceedings.