Brenda K. MONROE et al., Plaintiffs-Appellees,

v.

BOARD OF COMMISSIONERS OF the CITY OF JACKSON, TENNESSEE, etc., et al., Defendants-Appellants.

No. 19720.

United States Court of Appeals, Sixth Circuit.

June 19, 1970.

Russell Rice, Jackson, Tenn., for appellants.

Sylvia Drew, New York City, Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, James M. Nabrit, III, Norman Chachkin, New York City, on the brief for appellees.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

PECK, Circuit Judge.

This case originated in 1963 with the plaintiffs' suit seeking an order requiring the defendants-appellants Board of Commissioners of the City of Jackson, Tennessee (hereinafter "the Board") to desegregate and reorganize the city's segregated dual school system. This is the second appearance of this case before our Court. It has also been before the Supreme Court once and before the District Court a total of three times. Each stop along the way in the judicial journey of this case (except for the most recent in the District Court) resulted in a reported opinion. The relevant facts and procedural history are set out in full in these prior reported opinions, and accordingly their treatment here will be brief.

The original desegregation plan submitted by the Board and approved by the District Court in 1963 (221 F.Supp. 968 (W.D.Tenn.1963)) called for pupil assignment on the basis of nonracial geographic zones, but with a free transfer provision permitting any pupil to transfer out of the school in his attendance zone into a school of his choice. In 1964 the plaintiffs returned to court with a Motion for Further Relief, alleging that the Board had administered the desegregation plan in a discriminatory manner. Following hearings the District Court determined that the Board had discriminated in the administration of the free transfer provision and enjoined further such acts. The Court also found that the geographic attendance zones for the elementary schools had been racially gerrymandered, but rejected the plaintiffs' similar contention with respect to the junior high school attendance zones.

Finally, the District Court refused to order faculty integration, but did enjoin enforced segregation of the faculties. (244 F.Supp. 353 (W.D.Tenn.1965)). Upon appeal this Court affirmed the District Court in all respects except as to faculty integration and remanded the case for further proceedings with respect to that issue. (380 F.2d 955 (6th Cir. 1967)). The Supreme Court reversed that portion of the judgment of this Court which affirmed the judgment of the District Court, and held that a free transfer provision which tends to delay the conversion from a segregated dual school system to a unitary, nonracial, nondiscriminatory school system is constitutionally impermissible. (391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1967)).

Upon remand to the District Court the Board offered a revised desegregation plan retaining essentially the same geographic zones of the prior plans as well as the free transfer provision of the prior plans. The plaintiffs filed objections to the Board's revised plan and a hearing was held in the District Court, which ordered the free transfer provision stricken from the plan and the geographic zones redrawn to accomplish greater desegregation. The Court also ordered the Board to take certain steps with regard to new school construction and faculty desegregation. Following entry of that order the Board requested a stay with respect to the elimination of the free transfer provision and the revision of the zones. The Court granted the motion with respect to the zones but refused to stay the elimination of the free transfer provision.

■ The Board has raised in this appeal issues concerning each facet of the District Court's order, but it has candidly stated that it is primarily concerned with the reinstatement of the free transfer provision. We conclude, however, that the District Court was clearly correct in striking the free transfer provision from the Board's revised plan. The Supreme Court opinion in this case re-peatedly states that the free transfer provision of the Board's plan *in this case* is constitutionally impermissible. For example, in laying the fundamental framework for the consideration of the issues in this case, the Supreme Court stated:

"The principles governing determination of the adequacy of the plan as compliance with the Board's responsibility to effectuate a transition to a racially nondiscriminatory system are those announced today in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716, supra. Tested by those principles *the plan* is clearly inadequate." 391 U.S. at 456–457, 88 S.Ct. at 1703–1704 (Emphasis supplied).

The Court then went on to comment that "at the implicit invitation of the Board" (391 U.S. at 459, 88 S.Ct. at 1705), in the 1967–68 school year all of the white students assigned to the formerly "Negro" junior high school exercised their option to transfer into one of the formerly "white" junior high schools, and that a majority of Negro students assigned to the formerly "white" junior high schools transferred out. The Court concluded:

"Plainly, *the plan* does not meet respondent's 'affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch.' Green v. County School Board [391 U.S. 430, 88 S.Ct. 1689], supra, at 437–438." 391 U.S. at 458, 88 S.Ct. at 1704 (Emphasis supplied).

We therefore hold the law of this case to be that a free transfer provision is unacceptable as part of a desegregation plan for the Jackson city school system.

Despite the clear language of the Supreme Court's opinion, the Board contends that since the Supreme Court did not forbid the use of a free transfer provision in every desegregation plan where such a provision is required by "legitimate local problems" (391 U.S. at

459, 88 S.Ct. 1700), it was entitled to retain the free transfer provision in its plan because of two "legitimate local problems" of the Jackson city school system.

The Board asserts first that a desegregation plan without a free transfer provision will cause a dramatic change in the residential patterns of the City of Jackson; that without a free transfer provision white parents will move from the attendance zone of any school in which an integration ratio greater than 30% Negro to 70% white is achieved into the attendance zone for a school with fewer Negroes; and that greater resegregation rather than desegregation will be the ultimate result. This is in short the so-called "white flight" argument which has been rejected before and must be rejected again. It should be noted first that the evidence offered to support this contention below was found by the District Court to be merely speculative and of extremely limited probative value. More important, however, this same contention was presented to and rejected by the Supreme Court in this case:

> "We are frankly told in the Brief that without the transfer option it is apprehended that white students will flee the school system altogether. 'But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them.' Brown II, 349 U.S. [294] at 300, 75 S.Ct. [753] at 756 [99 L.Ed. 1083]." 391 U.S. at 459, 88 S.Ct. at 1705.

■ Disruption in the processes of education and administration resulting from the integration of white and Negro students with widely varying academic achievement levels and socio-economic backgrounds is urged as the second "legitimate local problem" justifying the retention of the free transfer provision, but the Board's contention in this regard is similarly without merit. As the District Court found, while there may be some disparity in the achievement levels of students from different socio-economic backgrounds, greater, not less, student and faculty desegregation is the proper manner in which to alleviate the problem. Moreover, achievement level disparity which might justify assignment based on individual capacity, and which could thus become self-perpetuating, clearly cannot be the justification for a continuation of racial classification within the entire school system. *See* Jackson Municipal Separate School District v. Evers, 357 F.2d 653, 654 (5th Cir.), cert. denied, 384 U.S. 961, 86 S.Ct. 1586, 16 L.Ed. 2d 673 (1966); Stell v. Savannah-Chatham County Board of Education, 333 F.2d 55, 62 (5th Cir.), cert. denied, Roberts v. Stell, 379 U.S. 933, 85 S.Ct. 332, 13 L.Ed. 2d 344 (1964).

The next issue concerns the attendance zones submitted by the Board as part of the revised desegregation plan, which, as stated above, are essentially the same as those submitted in the prior plans. Although these zones were not disturbed on appeal by this Court or the Supreme Court, the District Court ordered the Board to submit a revised zoning plan designed to accomplish greater desegregation. The Board contends that the order was improper in light of the reviewing courts' failure to disturb the zones in the prior appeals in this case. The Board also contends that revision of the attendance zones is prohibited by section 407(a) (2) of the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6) where the purpose thereof is the assignment of students in order to achieve a racial balance.

■ In examining this issue we must begin with the fundamental principle that where the state has historically operated a dual, segregated school system, the local school boards are now charged with an affirmative duty to take whatever steps might be necessary to eliminate segregation by race and convert to a unitary school system. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1967); Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1967);

Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700 (1967). The basic test of the acceptability of a plan is whether it "promises realistically to work; and promises realistically to work *now.*" Green v. County School Board, *supra,* at 439, 88 S.Ct. at 1694.

■ The District Court, in examining the record before it, has apparently determined that revision of the attendance zones is necessary to insure the Board's compliance with its affirmative duty to disestablish segregation with a plan which "promises realistically to work *now.*" There is nothing in the record, including the failure of the prior reviewing courts to disturb the zoning, which would justify disturbing the District Court's determination. Nor does the absence of a finding that the present zones were racially gerrymandered or that the Board acted in bad faith preclude the District Court from ordering this remedial relief. Green v. County School Board, *supra,* at 439, 88 S.Ct. 1689; Jackson v. Marvell School District No. 22, 416 F.2d 380, 385 (8th Cir. 1969); Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682, 684 (5th Cir.), cert. denied, 396 U.S. 940, 90 S.Ct. 375, 24 L.Ed.2d 242 (1969).

■ The Board's assertion that the District Court's order requiring revision of the zones was designed to achieve a predetermined racial balance [1] in the schools in violation of section 407(a) (2) of the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6) is also without merit. That section authorizes the Attorney General to bring civil actions against college authorities or local school boards seeking whatever relief is appropriate and necessary for the achievement of desegregation in the respective colleges or school systems. The section also gives District Courts jurisdiction in such civil actions but contains the proviso:

"[N]othing herein shall empower any official or court of the United States to issue any order seeking to achieve

a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

The plain language of the proviso shows that it was intended to neither enlarge nor limit the "existing power of the court" in the premises. The proviso clearly was not intended to affect the equitable powers of the courts to issue decrees requiring disestablishment of the state imposed segregated dual school system in compliance with constitutional mandates. United States v. School District, 151, Cook County, Illinois, 404 F.2d 1125, 1130 (7th Cir. 1968); United States v. Jefferson County Board of Education, 372 F.2d 836, 880 (5th Cir. 1966), *aff'd en banc,* 380 F.2d 385 (5th Cir.), cert. denied sub nom Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Keyes v. School District No. 1, Denver, Colorado, 303 F.Supp. 289, 298 (D.Colo. 1969).

■ The remaining issues concern those parts of the District Court's order pertaining to new school construction and faculty desegregation. In its revised plan the Board proposed that:

"New schools and school facilities will be programmed, planned and constructed without regard to race, to serve all citizens equally well, using accepted and recognized educational factors as a guide for determining when, where, type and size of new construction."

The District Court properly determined, however, that the above proposal did not meet the Board's affirmative obligation "to convert to a unitary system" (Green v. County School Board, *supra,* at 437–438, 88 S.Ct. at 1694), and ordered:

"New schools, additions to existing schools and the use of portable class

---

1. It should be noted that the District Court expressly disavowed any intention of imposing upon the schools a quota system based on race.

rooms shall be programmed, planned and constructed in furtherance of the Board's affirmative duty to convert to a unitary system free from racial discrimination and in accordance with other factors such as budgetary limitations, location of students, age level of students of the school involved, safety of students, nonracial educational factors and any other relevant nonracial factors necessary to maintain a sound educational system."

The order was correct. *See* United States v. Jefferson County Board of Education, *supra*, 372 F.2d at 900; United States v. Board of Public Instruction, Polk County, Florida, 395 F.2d 66, 70 (5th Cir. 1968).

With regard to faculty desegregation, the Board proposed to deal with all faculty, staff personnel and other employees "on the basis of merit and applicable educational factors, without regard to race." The District Court rejected the proposal and instead ordered the Board to employ, promote and assign faculty and other personnel "in furtherance of a goal of removing the former racial identity of a school." Again the order was properly designed to insure the Board's compliance with its "affirmative obligation." *See* United States v. Montgomery County Board of Education, 395 U.S. 225, 235, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). Moreover, it is supported by both the holding of this Court in the first appeal of this case wherein it was stated that:

> "[T]he Board must exercise its authority in making faculty assignments so as to assist in bringing to fruition the predicted benefits of school desegregation," (380 F.2d 955, 960),

and by the record in this case which shows that up to and including the 1968–69 school year there has been absolutely no faculty integration in the Jackson school system. Those schools which had formerly been "white" schools still had an all white faculty, and those which had been "Negro" schools still had an all Negro faculty.

Finally, the District Court's order directing the Board to seek the assistance of the Title IV Civil Rights Center of the University of Tennessee in formulating a plan of faculty desegregation was not improper in light of the facts of this case.

The judgment of the District Court is affirmed.