Deborah A. NORTHCROSS et al.

v.

BOARD OF EDUCATION, MEMPHIS CITY SCHOOLS et al.

Civ. No. 3931.

United States District Court,
W. D. Tennessee, W. D.

April 20, 1972.

Louis Lucas, William Caldwell, Memphis, Tenn., for plaintiffs.

Jack Petree, Ernest G. Kelly, Jr., Memphis, Tenn., for defendants.

## MEMORANDUM DECISION

ROBERT M. McRAE, Jr., District Judge.

This Memorandum Decision pertains to the most recent hearing in this twelve-year-old case which was filed by the original plaintiffs as a class action seeking equal protection of the laws by the desegregation of the defendant school system. The defendant system had maintained racially separate public schools contrary to the holding of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

For the purpose of this ruling, it is not necessary to delineate in detail the early proceedings in this case. Suffice it to say, the Court of Appeals for the Sixth Circuit in 1962 and 1964, after appeals from this Court by the plaintiffs, remanded the case for further proceedings. 302 F.2d 818, 333 F.2d 661. In 1966 the defendants inaugurated a freedom of transfer plan, and, for the first time, completely abandoned the practice of assigning students on the basis of race.[1] No further proceedings were had in the cause until August 1968, when the plaintiffs filed a Motion for Further Relief based upon Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and its companion cases, Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), and Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). That motion of the plaintiffs sought the elimination of the free transfer plan of the defendants and, among other things, complete faculty desegregation. On May 15, 1969, this Court ordered additional faculty desegregation for the 1969–70 school year and approved a modification of the transfer provision. The Court also held that the existing and proposed supplemental plans of the defendants did not have real prospects for dismantling the state imposed dual system at the earliest practicable date. Therefore, the defendants were directed to file with the Court, prior to January 1, 1970, proposals for revised zone boundary lines with enrollment figures by race to enable the Court to re-

[1]. The 1964 opinion of the Court of Appeals reflects that the defendants accelerated their grade-a-year plan so that all Negro pupils would be allowed to attend desegregated schools in 1970 instead of 1972 but the Court of Appeals suggested that it be further accelerated to 1966.

consider the adequacy of the transfer plan. That ruling of this Court was appealed by the plaintiffs. While the appeal was pending, the Supreme Court of the United States rendered its opinion in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Applications for extraordinary relief were sought by the plaintiffs in both the Court of Appeals and the Supreme Court. On March 9, 1970, the Supreme Court of the United States held that this Court's 1969 finding, that the Board's plan did not have real prospects for dismantling the state imposed dual system at the earliest practicable date, was supported by substantial evidence. The case was remanded with directions that this Court proceed promptly to consider the issues before it and to decide the case consistently with Alexander v. Holmes County Board, *supra*. Northcross v. Board of Education, Memphis City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970).

Pursuant to that remand this Court conducted further evidentiary proceedings and on May 1, 1970, ruled that under the then existing plan the defendants were not maintaining a unitary system as required by Alexander v. Holmes County Board, *supra*. This Court ordered further modifications to the desegregation plan of the defendants. With regard to pupil assignment, the Court ordered that the Board not permit any student to transfer from one geographical zone where he was in the minority race to another zone where he would be in the majority race. In that ruling the Court also ordered the defendants to seek the assistance of the Title IV Educational Opportunities Planning Center at the University of Tennessee, concerning its plan of faculty desegregation. Northcross v. Board of Education, Memphis City Schools, 312 F.Supp. 1150 (W.D. Tenn.1970). Subsequently, the Court ordered complete faculty desegregation by requiring that the racial composition of the faculty of each school comply with the ratio of white and Negro teachers in the entire system within a 10% plus or minus tolerance. The defendants were allowed two years to place that faculty plan in effect, and, at the present time, they are operating under that plan.

The student assignment phase of the May 1, 1970, ruling of this Court was appealed by the plaintiffs, and on June 7, 1971, the Court of Appeals filed its opinion wherein the cause was remanded to this Court for consideration of the defendant system's plan of desegregation in the light of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), and Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971). Northcross v. Board of Education of Memphis City Schools, 444 F.2d 1179 (1971).

After the remand, the Court and counsel for both sets of parties were of the opinion that outside assistance was appropriate for the pupil assignment phase of the case. The Court sought assistance from the Division of Equal Educational Opportunities of the United States Office of Education. Pursuant to the Court's direction, the defendants requested assistance from that Division, and a seven man team of educators was appointed by the Title IV Director of the Division to assist the Board and the Court.

After an initial investigation, the team requested further instructions from the Court. The request caused the Court to conclude that a preliminary evidentiary hearing was necessary in the light of *Swann* and *Davis* and the issues in the case. In November 1971, an eight-day evidentiary hearing was conducted and on December 10, 1971, this Court rendered its opinion on the issues therein. In that ruling the Court cited Section V (2) of *Swann* on page 25, 91 S.Ct. 1267 which directed the district courts to scrutinize schools of one race when the plan of desegregation of a school board contemplates a continued existence of some schools that are all, or predominantly all, of one race.

The Court found the pupil attendance under the existing plan to be as follows:

"During the current school year (1971–72) the defendant system is based upon a curriculum arrangement of elementary schools of grades 1 through 6, junior high schools of grades 7 through 9 and high schools of grades 10 through 12. There are 145,581 pupils, 53.6% of them are black and 46.4% of them are non-black (hereinafter referred to as white). Percentagewise, 87.7% of the blacks are in 90% or more black schools and 76.4% of the whites are in 90% or more white schools. There are 162 schools, 67 of them are 90% or more black and 61 of them are 90% or more white (29 are all black and 18 are all white.) Percentagewise, 37.6% of the 162 schools are 90% or more white and 41.3% are 90% or more black." Page 3, Dec. 10, 1971 Opinion.

After the remand by the Court of Appeals on June 7, 1971, and prior to the commencement of the school year, this Court ordered the defendants to reopen the transfers and permit any pupil to transfer from an attendance zone wherein the pupil was in the majority race to a zone where he would be in the minority race, with a proviso that the defendants would afford transportation for the transferring pupil at Board expense on existing public transportation facilities. This reopening of the transfer policy prompted 249 additional requests for transfers, bringing the total for the current year to 1337 majority to minority transfers.

Prior to the November hearing, the Court required the defendants to indicate what changes in the plan of desegregation they then thought should be made in the light of Swann and Davis. The defendants proposed a modification of their existing plan of desegregation by discontinuing the practice of allowing optional attendance of students living on zone boundary streets and on streets heretofore designated as "pockets and coves". The Board further proposed that three schools in southeast Memphis be clustered and paired in 1972–73, due to the opening of a housing project in that area after the current school year commenced. The Board further proposed zone changes with regard to Lester-Carpenter, East and Treadwell Schools, due to the fact they admitted that the Lester and East zones were based upon a vestige of the former dual system.

On page 12 of its ruling of December 10, 1971, this Court concluded as follows:

"In regard to the over-all issue of one-race schools, this Court concludes that the proof establishes that the defendant Board and its predecessors have played a significant role in establishment of the present large number of one-race schools which have resulted from discrimination by numerous persons and groups. Therefore, it is incumbent upon the Court to require the Board to request that the team of the Division make recommendations to the defendant Board for ways that it should amend its present plan of desegregation to the end that the Memphis schools will be in compliance with the Constitution of the United States."

This Court further held that it was apparent that the segregation evidenced by one-race schools could not be effectively eliminated in the near future without transporting some students. The Court invited the attention of the team of educators to certain limitations in Swann and Davis and, pursuant to page 37, 91 S.Ct. 1289 of Davis, directed the team to propose alternate plans for further desegregation which would be educationally sound and which would achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.

On January 1, 1972, a new nine member Board of Education for the City of Memphis was installed in office. This was a reorganized Board which had been elected in early November 1971, pursuant to an amendment to the state law pertaining to the Board of Education of the Memphis City Schools. It consists of

eight persons, including three Negroes, who have never served on the School Board previously, and one person who was a member of the former five member all-white board.[2]

On January 12, 1972, it was necessary for this Court to enter an order modifying previous orders in the cause. This was necessary because the Associate Commissioner of Equal Educational Opportunities of the United States Office of Education had caused the members of the team, designated to assist the Court and the Board, to discontinue previously offered assistance. In view of the belated and unexpected change in their policy and procedure, the Court concluded that neither the Court nor the Board could rely upon the proffered assistance of the Department of Health, Education and Welfare in carrying out the mandate of the Court of Appeals. The Court, therefore, relieved the members of the team from further participation in the case in their capacities as designees of the Division of Equal Educational Opportunities. The Court directed the defendants to cause to be prepared and filed the alternate plans called for in the Court's Memorandum Decision of December 10, 1971.

The defendants assigned staff personnel of their system to the task of complying with this directive to prepare the alternate plans. On March 3, 1972, these plans designated as "Plan A" and "Plan B" were filed in the cause. On the same date the plaintiffs filed a plan of desegregation which they had caused to be prepared.

In its December 10, 1971, ruling, the Court reserved to the defendants the right to file objections to the alternate plans, and further indicated that a hearing would be had on those objections and in the light of plaintiffs' plan.

The Court set the hearing on the respective plans for March 28, 1972. Prior thereto, the defendants filed in the cause three more alternate plans, designated as Plans I, II and III.

In spite of this Court's ruling in its December 10, 1971, opinion based on *Swann* and *Davis* and the Court of Appeals remand opinion, at the recent evidentiary hearing, the defendants contended that the transportation of students to desegregate schools is improper and noxious. In their post hearing brief the defendants contend as their first alternate that they be allowed to make the minimal boundary adjustments set forth in Plan I and adopt what they refer to as "The Memphis Plan".[3] The Memphis Plan is primarily a combination of procedures designed to attack the disparity of achievement between students from different socio-economic levels. It also includes the continuation of the existing Cultural Exchange Program, a program whereby certain groups, such as glee clubs, from schools of one race are bused, on a voluntary basis, to schools of the opposite race for visits or performances.

While it is true that Negroes predominate the lower socio-economic levels in this community and Negroes will therefore benefit from remedial education methods, the so-called Memphis Plan is not a desegregation plan.

In support of the Memphis Plan and their position that transportation for desegregation purposes is improper, the defendants rely heavily upon the portion of the Court's May 1, 1970 opinion which read as follows:

"This serious problem [the disparity of achievement between Negro and white students] has existed for many years and is not peculiar to the Memphis system. The exact causes are not known nor are the cures. This Court

2. One of the elected Negro members of the new Board had served as an advisory member of the former Board.

3. The post hearing contention that Plan I is their first alternate suggests a lack of good faith on the part of the defend-

ants, because Plan I fails to incorporate the pairing of Lester-Carpenter, East and Treadwell. This pairing was proposed by the then defendant Board to correct a situation which they had admitted was a vestige of the discriminatory system.

concludes from the proof that the solution is not to be found in transporting an undetermined number of Negro or white students to distant parts of the city. The transportation time and money could be more profitably spent by attacking the disparity of achievement problem in other ways, and no problem should have a higher priority." 312 F.Supp. at 1157.

Insofar as that statement indicated that this Court or the school authorities are allowed to substitute attacking the educational achievement problem for achieving the greatest possible degree of desegregation, taking into account the practicalities, the May 1, 1970 statement of this Court was in error.

On June 19, 1970, the Court of Appeals for the Sixth Circuit held that greater, not less, desegregation is the proper manner to alleviate the problem of disparity of achievement. Monroe v. Board of Commissioners, Jackson, Tenn.; 427 F.2d 1005, 1008 (C.A. 6, 1970).

In May, 1970, this Court did not have the benefit of the opinion in *Swann*, particularly with reference to the portion setting forth guidelines concerning one-race schools, construction and location of schools and the transportation of students. In addition, the Court did not have the benefit of *Davis* wherein the Supreme Court remanded that case because, inter alia, the lower courts gave inadequate consideration to the possible use of bus transportation to desegregate the schools in that system. Furthermore, this Court did not have the benefit of North Carolina State Board of Education v. Swann, 402 U.S. 43, on page 46, 91 S.Ct. 1284 on page 1286, 28 L.Ed.2d 586, wherein, the Supreme Court stated that in Swann it had noted that "bus transportation has long been an integral part

of all public educational systems, and it is unlikely that a truly effective remedy could be devised without continued reliance upon it." [4]

In addition, the Court did not have the benefit of the opinion of the Court of Appeals which remanded this case, wherein the court stated that busing "may be mandatory in some areas, such as in the pockets and coves, pairing of schools, transfers, or in the annexed areas." 444 F.2d at 1183.

As this Court noted in its December 10, 1971, opinion, the Supreme Court of the United States has repeatedly emphasized that a plan of desegregation from the former state required dual systems is judged by its effectiveness. Since 1964 the Court of Appeals and this Court have tried various means of altering zone boundary lines without producing effective desegregation of the schools in the City of Memphis. In addition, the efforts of this Court in the past with regard to transfers have produced inadequate results toward effectively desegregating the schools.

■ Counsel for the defendants continue to state that assigning students on the basis of race to correct a racial imbalance is as noxious now as it was for the Board to assign students to separate schools on the basis of race in the past. At the recent hearing it was asserted that effectively dismantling the former separate school systems by the use of transportation will deprive some students of the right to attend the school which is closest to their residences. However, this reasoning may not prevail when the asserted right of these students is a lingering result of the former discriminatory separate systems, and those systems have not been effectively disestablished. On this point the Supreme

---

4. Some students in this system have relied upon bus transportation via public transit facilities at their own expense and by being transported to school at the county expense prior to the annexation of certain areas in recent years. Furthermore, as the Court noted on page 11 of its December 10th decision, this system contracted with the county system to transport Negro students, who lived in the Frayser area, to county schools to avoid desegregation after the Frayser area was annexed in 1958.

Court said in North Carolina State Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971):

"Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate existing dual school systems."

The position taken by the defendants in the recent hearing appears to be in accordance with a pattern of resisting efforts which require involuntary transfers of faculty or students to the end that a significant degree of desegregation will be accomplished. It appears to this Court that the defendants and their predecessors have underestimated severely the present and future benefits to the students and the community from the operation of an effectively desegregated school system.

For the reasons set forth above, this Court reiterates the conclusions set forth on page 12 of its December 10, 1971, Memorandum Decision, wherein the Court stated:

"However, it is apparent that the segregation evidenced by the one-race schools caused by discrimination cannot be effectively eliminated in the near future without transporting some students."

With regard to practicality of the use of buses, the Court notes that the so-called "Neighborhood School" concept has caused the defendants to build schools in which there is considerable excess space that is unused under the non-transportation method. Hearing Exhibit #18 introduced in the November hearing reflects that there are 71 schools in the system that have attendance figures of 90% or less than their optimum capacity. In some instances the vacancy rate is grossly excessive. For example, Maury School is 65% vacant, Grahamwood School is 54% vacant, Avon School is 36% vacant, and Hyde Park is 31.8% vacant. On the other hand, under the present attendance figures, there are 29 schools that are more than 10% over capacity.[5] Therefore, with regard to capital improvement and maintenance costs the under-capacity schools are creating unnecessary expense under the present system, and the over-capacity schools are interfering with "quality education".

In addition, proof at the recent hearing establishes the fact that in the 1970–71 school year, in the State of Tennessee, 46.47% of all public school pupils in the state required transportation to attend their respective schools.

In *Swann*, on page 12, 91 S.Ct. 1267, 28 L.Ed.2d 554 the Supreme Court noted that the district courts are called upon to act under their equitable jurisdiction in fashioning the proper remedies for a transition from a dual school system to an effectively desegregated system. The Supreme Court again noted, as it had in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), that courts of equity have traditionally applied practical flexibility by shaping remedies which adjust and reconcile public and private needs. The Supreme Court, on pages 12 and 13, 91 S.Ct. on page 1274 of *Swann*, quoted from a portion of its opinion rendered in Brown v. Board of Education, Ibid, wherein the Court stated, in part:

"At stake is the personal interest of the plaintiffs [Negroes] in admission to public schools as soon as practicable on a nondiscriminatory basis. To ef-

5. This over capacity condition is being partially remedied by the construction of new schools or additions to existing schools which were not ready for the current school year. For example, additional facilities are under construction to relieve the congestion at all black Hamilton High School at a cost of more than $7,000,000.00. It presently has 3086 students and an optimum capacity of 2500 students and a maximum capacity of 2900 students. It has exceeded its optimum capacity every year since 1964–65.

fectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954 decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them."

In Section V of *Swann*, on pages 22 to 31, 91 S.Ct. 1267, the Supreme Court considered four problem areas pertaining to the central issue of student assignment. Area (1) is entitled "Racial Balances or Racial Quotas". Although the Court approved the limited use of mathematical ratios applied by the district court in the *Swann* case, in doing so the Supreme Court noted that a district court may not require "as a matter of substantive constitutional right, any particular degree of racial balance or mixing" in each school system.[6]

The second area considered in Section V of the *Swann* opinion was entitled "One-race Schools". The Supreme Court noted that the "district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." However, the Court did note that in some circumstances certain schools may remain all, or largely, of one race until new schools can be provided or neighborhood patterns change. The Court noted that, in this situation, a provision for optional transfer of students in the majority racial group to other schools where they will be in a minority is an indispensable remedy to lessen the impact of the state imposed

stigma of segregation. This optional plan must provide free transportation and space in the schools to which the students desire to transfer.

Area (3) was entitled "Remedial Altering of Attendance Zones". In this section of the opinion the Court considered pairing, clustering or grouping of schools with attendance assignments made deliberately to accomplish the transfer of Negro students out of formerly segregated Negro schools and the transfer of white students to formerly all-Negro schools. The Court indicated that no "fixed or even substantially fixed guidelines can be established as to how far a court can go, but it must be recognized that there are limits."

The fourth problem area was entitled "Transportation of Students." Although the Court very definitely held that busing is appropriate when the assignment of students to the schools nearest their homes would not produce an effective dismantling of the dual system, the Court indicated that no rigid guidelines as to student transportation can be given for application to the infinite variety of problems. The district courts were directed to weigh the soundness of any transportation plan in the light of what the Court had said in subdivision (1) "Racial Balances or Racial Quotas", (2) "One-race Schools" and (3) "Remedial Altering of Attendance Zones".

It is now incumbent upon this Court to determine how the defendant system might achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation in the light of the various plans offered and the proof pertaining to those plans.

Before considering the respective plans, this Court notes two general areas of practicalities set forth by the Court of

---

6. This particular degree of racial balance with regard to each school in the system based upon the ratio of the races of the pupils in the system as a whole is to be distinguished from the use of minimum ratios approved for faculty desegregation in United States v.

Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) and for student assignments in North Carolina State Board of Education v. Swann, 402 U.S. 43, 46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971).

Appeals in its remand opinion. The Court of Appeals said that this case may be distinguished from *Swann* in that extensive busing had been previously provided in connection with the regular operation of the Charlotte-Mecklenburg school system. The Court of Appeals also said that the Board in Swann had totally defaulted in its duty to submit an acceptable plan of desegregation and had adopted an arbitrary attitude. 444 F.2d at 1183.

■ As the record indicates, this system has never afforded transportation as part of its regular operation. With regard to that portion of the Court of Appeals opinion pertaining to the default on the part of the Board in *Swann* and its arbitrary attitude, this Court noted (page 14 of its Memorandum Decision of December 10, 1971) that the present plan of desegregation, including the location of the schools, has been in some measure sanctioned by this Court and the appellate courts. Therefore, it appears to this Court that whatever method is adopted to correct the present situation must take into account as a practicality the location of the various schools which presently exist. Of course, this practicality does not justify taking only minimal steps to correct a large number of one-race schools presently found in this system.

For the reasons heretofore indicated, the team of educators appointed by the Division of Equal Educational Opportunities of the United States Office of Education were relieved, and the defendants were directed to cause to be prepared the alternate sets of recommendations referred to in the Court's December 10, 1971, Memorandum Decision. The primary responsibility for preparing the recommendations was assigned to Dr. O. Z. Stephens, Director of the Division of Research and Planning of the defendant system. Dr. Stephens was assisted by members of his own staff, other personnel from the defendant system and outside consultants, including two of the former members of the team appointed by the Division of Equal Educational Opportunities. The recommendations were filed on March 3, 1972, in a binder entitled "Court Ordered Plan A and Court Ordered Plan B." The document consists of 88 pages, plus appendices A through H and two sets of maps pertaining to both plans.

Plan A was in response to the Court's direction set forth on page 16 of its Memorandum Decision of December 10, 1971, as follows:

> "One set of recommendations shall not have any minimum or maximum percentage factor. It shall be based upon the maximum use of pairing adjacent or nearby schools without transportation, changing zone lines of adjacent or nearby school zones, and closing some schools, plus the minimum use of transportation of students by clustering, pairing, non-contiguous zones, or other methods."

The plan basically makes use of existing attendance zones, and it undertakes to afford significant desegregation by pairing or clustering schools with adjacent or contiguous boundaries. Students who live close enough to these paired or clustered schools are expected to attend by walking or effecting their own transportation. However, wherever the pairing or clustering creates distances in excess of a mile and one-half, or unusual problems occur, the students will be transported by the defendant system. The plan also makes some boundary changes. It rearranges some grade organizations of elementary and junior high schools. It reduces the need for additional capital improvements projects through the utilization of excess classroom space in certain areas of the city.

The pupil population in each zone was determined by adjusting the current enrollment figures by subtracting the number of students in that school on a transfer from another school zone and adding the number of students out of the attendance zone on transfer to another

school.[7]  Under Plan A it is estimated that transportation of 13,789 pupils will be required.  This represents less than 10% of the current pupil enrollment which will be somewhat increased by the addition of more schools for the coming year through annexation.

The study of the pupil population figures also disclosed that there are five schools that definitely can be closed. Those schools with the dates when they were built are as follows: Merrill, 1890, Wisconsin, 1901, Lennox, 1909, Pine Hill, 1918, Weaver (Frame construction) 1918. In addition the plan suggests options whereby two additional schools may definitely be closed.  Those are Maury, built in 1908, and Oakville, built in 1922. Furthermore, the study discloses that by rearrangement of certain zones in the Idlewild and Rozelle area, the defendant definitely will be relieved of the construction of another school in Glenview Park, which it had planned and sought approval from the Court to construct. Other closings, or partial closings, are also available in Plans A and B.  However, these closings and partial closings are based on the continued use of the facilities for such things as special education, different grade levels and research projects.  The economy that will result from this has not been computed but obviously it will be considerable now and in the future.

Plan B was the result of the alternate direction of the Court set forth on page 16 of its Memorandum Decision of December 10, 1971, wherein the Court stated as follows:

"The other set of recommendations shall be based upon an attempt to desegregate all schools necessary to the maintenance of the system so that no school will have a minority race of less than 30%.  This set of recommenda-

tions shall not be based entirely on busing.  It, too, should make use of other desegregation methods before transportation is to be used."

The 30% minority race provision was adopted by the Court in an effort to establish minority situations which would avoid the current isolation of small minorities in a large number of schools. The provision was not absolute, and the Court noted that there were limitations set forth in *Swann* and *Davis* whereby certain schools may not be established with 30% minority attendance figures. Under Plan B as proposed, many of the schools would not meet the 30% minimum.  Twenty-three would still have minorities of less than 10%.  H.E. 47.

Plan B superimposes a series of pairings and some boundary adjustments on top of Plan A.  All of the elementary schools not paired in Plan A are paired in Plan B except schools in 13 of the zones.  All junior high schools not paired in Plan A are paired in Plan B.  Plan B is the same as Plan A with regard to the high schools.  However, because all of the junior high schools are paired in Plan B, there would be additional desegregation in those facilities which have junior high and high schools at the same location.

Estimates set forth in the report to the Court filed March 15, 1972, indicate that under Plan B 39,085 students would be transported by buses.  Since Plan B is superimposed on Plan A and the pairings are of noncontiguous schools, great distances are involved in the pairings. There are pairings of schools in 22 instances where the distance from the farthest residential area in one school zone to the receiving school is in excess of ten miles, and there are 10 instances where the estimated adjusted driving time in minutes from the residential area

---

7.  The method used for determining the pupil population is not as accurate as a pupil locator map.  In this regard the Court is not unmindful of the comment of the Court of Appeals on page 1182 of its remand opinion that a pupil locator map would be beneficial.  Soon after the remand, the team of educators and defendant staff personnel investigated the problems of preparing a pupil locator map.  Based on their report, it was agreed that such map was not feasible from the standpoint of the time it would require to prepare it.

in one school zone to the receiving school exceeds 40 minutes. The adjusted driving time is based upon test drives in accordance with the criteria in Hearing Exhibit 6, plus five minutes.

The Plaintiffs' Plan was prepared by Dr. Gordon Foster, Professor of Education at the University of Miami and the Director of the Florida School Desegregation Consulting Center. Under this plan the system was divided into four geographical zones, primarily based upon the existing elementary school zones. The elementary schools in each zone were paired after taking into consideration the capacities of the respective schools and the race of the students in the existing zones. Junior high school attendance figures were based upon leaving all junior highs as seventh through ninth grade units with the students coming from the elementary schools on a feeder basis. By the same token, the high school pupils would be assigned to schools consisting of tenth through twelfth grade units on a feeder basis from the junior high schools. The attendance figures for the junior high and the high schools were based upon formulae which took into consideration, by race, the number of students in the respective units compared to the number of students in the system as a whole. Under this plan it is estimated that approximately 61,530 students would be transported.

Although Dr. Foster has heretofore investigated the Memphis School System as an expert witness in prior hearings, his actual knowledge of the community is considerably limited. In his testimony, Dr. Foster indicated that his plan contemplated that local officials of the defendant system would make adjustments to compensate for the inaccuracies due to his lack of familiarity with the community, the formulae used for the junior and high school attendance figures, and any other inaccuracies.

The plan concludes with a condition which reads as follows:

"If such a plan is to work effectively the entire City of Memphis would have to be dedicated to this end. Students, parents, faculties, administrators and the entire community will all have to make their contribution to a long range integration program." Pages 45–46 Plaintiffs' Plan.

As heretofore indicated, shortly before the recent evidentiary hearing, the incumbent Board filed three alternate plans designated as I, II and III. Plans I and II are in furtherance of the position of a majority of the defendant Board wherein they contend that the transportation of students is not a proper method of desegregation. Plan I consists of a small number of boundary changes. In his testimony, Dr. Stephens indicated that little could be done with this method because prior efforts of the defendants by means of boundary changes had accomplished about as much as could be done. Plan II is based upon boundary changes and some pairing and clustering but with no transportation. Plan III is the same as Plan A but the transportation is limited to elementary schools. At the hearing very little was said about Plan III because the Board took the position that all transportation was improper, and the plaintiffs contended for their plan.

The projected cost estimates of transportation submitted by the parties and the proof pertaining to the costs of the respective plans show wide variations and some discrepancies.

The defendants have estimated the annual operating costs for transporting 13,-789 students under Plan A to be $629,192, with an initial capital cost of $1,664,192, under a school operated plan. Estimates for the same number of pupils under a contract plan, with the contractor owning and operating the buses, are $744,330 annually. These estimates are based upon four trips per bus to and from the respective schools. The costs are also based upon maximum loads at the seated capacity of each vehicle. In the case of the school operated plan the estimates were based upon an annual pupil cost of $45.63 which was obtained from average costs per pupil in the State of Tennessee.

Under Plan B the defendants estimate that the cost of transporting the 39,085 students will be $1,783,490 annually, with an initial capital cost of $3,924,000, based upon a school operated plan. The same criteria were used for Plan B under the school operated plan as those used in the estimates for Plan A, except the number of trips per bus was estimated at three instead of four.

Plaintiffs have submitted annual operating costs of $2,354,220, $2,431,212 or $3,468,100 for transporting the estimated 61,530 students. These respective costs depend upon whether the Board buys it own buses and, if so, whether diesel or gasoline buses are used or as a third alternative, whether the buses are provided by contract carriers. The plaintiffs' figures pertaining to Board-owned buses do not include the original capital outlay for the purchase of the buses; however, the figures do include a depreciation figure based upon seven years. All estimates are based upon three trips per bus with each bus transporting its rated capacity plus a 10% overload. The costs were based also upon a Michigan formula using wages and depreciation as 63% of the total cost.

In addition to these cost estimates, the plaintiffs offered proof in the form of schedules of the existing Memphis Transit Authority public routes. Most of these routes go near the schools; however, no proof was offered to show how many students would be expected to ride which existing public transit buses and at what times. Therefore, the Court cannot make any finding that this means of transportation is a practical method of implementing the plaintiff's plan of desegregation.[8]

It appears to the Court that all of the estimates are lower than the actual costs

will be. Proof was offered pertaining to the average annual cost of transportation in different localities. That proof indicates that there are wide variations, which suggests to the Court that local arrangements and conditions affect the average annual cost. It must be remembered that this system has no prior experience with the use of regular pupil transportation.

From the proof it appears that all funds needed to pay the costs of transportation will have to come from funds already appropriated or to be appropriated by the city government. The state law and regulations pertaining to a partial reimbursement of transportation costs incurred by the counties do not recognize as a matter of right city boards of education as participants in the common fund appropriated by the state legislature. In the past, when bus transportation has been used by this defendant Board for limited purposes, the Shelby County Board of Education, by informal agreement with the City Board of Education, has included a claim for transportation reimbursement for the city in the county's claim. However, a regular and substantial claim by this type agreement would diminish the per pupil reimbursement for Shelby County and possibly other counties in Tennessee. Because the law does not permit city governments to participate in this fund as a matter of right, it is not probable that the Shelby County Board of Education will be willing to continue the practice and thereby diminish its funds.

This problem is further complicated by strained relations between the Shelby County and the City of Memphis Boards of Education, which have arisen over a dispute, and possible lawsuit, concerning the amount of money that the city board

8. The proof reflects an anomalous situation in Memphis, in that the publicly owned transit authority is suffering a financial crisis due to an insufficient number of riders, whereas, the publicly owned school system contends it cannot transport pupils because it has no buses for them to ride. However, having a substantial number of students transported on transit authority vehicles is a problem which cannot be solved without cooperatively resolving the problems arising from the fact that the times when students are going to and from school are the times of peak demand by regular transit patrons.

should pay the county board for the schools built by the county prior to recent annexations by the City of Memphis.

■ Upon consideration of all the plans, the proof offered at the hearing and the entire record in the cause, this Court is of the opinion that Plan A, with certain modifications, meets the criteria established and required by the Constitution of the United States as interpreted by the authorities. The practicalities of the existing situation in the City of Memphis limit the change in the plan of desegregation to this extent at the present time. Plan A will afford the defendant Board an opportunity to implement a system of transportation for its students, and thereby afford the defendants with an opportunity to observe the best ways and means for implementing further desegregation in the future. Plan A further meets the test of practicalities with regard to time of implementation and costs in the light of the circumstances existing at this time.

An option set forth in Plan A pertains to Maury Elementary School. This school was built in 1908. At the present time it has a student enrollment of 133 white students and 62 Negro students in a facility that has an optimum capacity for 520 students. Plan A, as originally proposed, calls for closing Merrill School and Maury School and assigning the pupils from those respective zones to Carnes School, which is located between the existing Merrill and Maury zones. The projected enrollment after the three schools are consolidated would be 1235 students, 1056 of them would be black and 179 would be white. The total combined enrollment for Carnes School would be well within the optimum capacity of 1400.

The option proposes that Maury not be closed and that it be operated as a separate zone. The Maury zone is adjacent to the zones of other schools in the center of the city which caused the Court to comment in its December 10, 1971, opinion to the effect that consideration should be given to trying to preserve those neighborhoods that have accommodated natural desegregation. If Maury School is maintained as a separate unit it will be operated as a school that is approximately 65% vacant in its use. For that reason, the Court believes that the option should be rejected and that Maury should be consolidated into the Carnes zone.

Another proposed option to Plan A pertains to a clustering in the southeast part of the city. This optional clustering plan consisting of Goodlet, Willow Oaks and Knight Road schools, is hereby approved. By the adoption of this option the defendants will close Oakville Elementary School and will be permitted to continue a long range study and survey in Sheffield School. The option proposed for pairing Lester-East and Treadwell is also approved.

Prior to the November hearing the Court allowed certain petitioners to intervene as amicus curiae in this cause. The intervenors are a nonprofit organization, "Vollentine-Evergreen Community Action Association, Inc." (VECCA), and individuals who sued as next friends for certain minors. The petition asserted that VECCA is an organization committed to promoting and maintaining a stable, racially integrated residential neighborhood in an area in north central Memphis. The approximate boundaries of VECCA are North Parkway on the south, Trezevant on the east, Brown on the north, and North Watkins on the west. Petitioners intervened in behalf of white high school students who, according to the petitioners, are being deprived of their constitutional right to attend integrated schools.

The individual intervenors, who live in part of the geographical area of VECCA, are assigned to the Northside High School zone. It is alleged that under the existing plan of desegregation of the defendants, the intervenors, as minority whites, are forbidden to transfer to a school where they would be in a truly integrated situation. It is further contended that Northside, with less than 2% white population, is not an integrated school within the meaning of the constitution. One of the officers of VECCA

testified as a witness for the plaintiffs in the November hearing, and his testimony did establish that the members of the organization are undertaking to promote neighborhood racial harmony in the VECCA area of the city.

Plans A and B enlarge the Northside zone by incorporating a portion of the Douglass High School zone. Douglass presently is over its optimum capacity and is an all-Negro school. On the other hand, Northside, one of the newer high schools in the system, presently has 1444 students with an optimum capacity of 1700.

At the recent hearing the Court inquired of Dr. O. Z. Stephens, if consideration had been given to placing the remainder of the VECCA area in the Central High zone. This was upon the theory that all of VECCA was included within the area that had accommodated desegregated schools and withstood the problem of changing the neighborhood racial makeup. Dr. Stephens indicated that consideration had not been given to that theory, but staff personnel would supply the Court with information pertaining to the number of students living in that area. After the hearing, information was supplied, and the Court has given further consideration to this possibility.

The information available to the defendant system and the Court is difficult to interpret because a portion of the VECCA area is presently in the Central High zone, and a relatively large number of white students from the area attend Central. When the boundaries of the VECCA area are examined on the map, it shows that to transfer the rest of that area to the Central High zone would require gerrymandering a sizeable portion of the proposed Northside zone. The corner of the gerrymandered portion would be within four blocks of Northside School. It should also be noted that Plan A contemplates a change of the Central zone to the south which incorporates a portion of the former Hamilton zone. Upon consideration, the Court has concluded that it should not alter the Northside zone.

■ The problem of isolated minority students of both races is a serious one for the defendant Board and the Court. Because of the holdings in *Green, Raney* and *Monroe, supra,* the former freedom of transfer plan of the defendants was found to be unconstitutional. This caused the Court to conclude that minority transfers should be discontinued in an effort to promote further desegregation. However, experience has shown that this method is not truly effective for desegregating most of the schools. On the other hand, after carefully examining the respective plans, the Court has concluded that it is not practical to provide the citywide transportation necessary to relieve the problem of isolated minorities. Until the Court is presented a plan within the practicalities of the situation, the Court knows of no solution to relieve this problem for the many students who find themselves in these isolated minority situations.

Because Plan A is based upon adjusted enrollment figures, all school zones which are paired or clustered, have boundary changes, or are otherwise changed by Plan A will have no transfers from those zones except for children of employees of the defendant Board, special education transfers and adjustment transfers. Schools in the system which are not changed by the implementation of Plan A as modified will have transfers for children of employees of the defendant Board, minority to minority transfers at the students' own expense, majority to minority transfers at the expense of the defendant Board on public transportation facilities, adjustment transfers, and special education transfers. All adjustment transfers shall be limited to situations where there has been a disciplinary or psychological problem for the student who is to be transferred. No adjustment transfers may be granted to a student where he will be transferred from a school where he is in the minority race to a school where he is in the majority

race. Special education transfers shall be limited to those students having a physical or mental handicap. Transfers for employees of the defendant Board shall be limited to a transfer from the zone of the pupil's residence to the school where the employee is regularly assigned.

Future site acquisitions and future construction shall continue to be subject to court approval after notice to counsel for the plaintiffs as presently required, with the additional proviso that future site acquisitions and construction shall take into consideration the possible use of transportation of students.

Plan A as modified and all other modifications of the existing plan shall be implemented commencing with the beginning of the school year 1972–73.

At the recent hearing, the defendants offered proof through Lee Thompson, Assistant Superintendent, Department of Personnel Services of the defendant system, to the effect that the pairing of schools will cause problems concerning faculty transfers, particularly in the light of the present court required minimum and maximum ratios of Negro and white teachers. Through the testimony of Mr. Thompson, the defendants requested that his staff and representatives of the teachers association be allowed to confer and propose a plan for the necessary teacher transfers, and that they be allowed to consider variations from the present minimum-maximum ratios. In the event that temporary variations from the present plan of teacher desegregation are thought to be necessary in the implementation of Plan A by the fall of 1972, counsel for the defendants may file with the Court a list of necessary variations for the consideration of the Court.

In this case the Court has been faced with extreme opposite positions taken by the respective parties. On the one hand, it appears to the Court that the defendants have failed to recognize and acknowledge the interpretations of the Constitution which impose upon the defendants the duty to make every effort to achieve the greatest possible degree of actual desegregation. It further ap-

pears that the defendants have overemphasized solvable problems as "practicalities" which justify the continued operation of an effectively segregated system. On the other hand, it appears to the Court that the plaintiffs have overemphasized the guidelines of constitutional law, while failing to take into account the practicalities of the situation. Therefore, the Court has been called upon to exercise its equity jurisdiction in favor of a plan between the two extremes. The Court earnestly believes that the approved plan meets the requirements of the Constitution. The Court fervently hopes that this will afford the defendants a means of ultimately achieving the goal of a desegregated school system in practice—not merely in principle.